# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-08-00337-CV

**In the Matter of M. P. A.**

**FROM THE DISTRICT COURT OF BELL COUNTY, 169TH JUDICIAL DISTRICT
NO. 222,074-C, HONORABLE GORDON G. ADAMS, JUDGE PRESIDING**

# M E M O R A N D U M   O P I N I O N

In 1999, M.P.A., then a juvenile, was adjudicated delinquent for committing the offense of aggravated sexual assault of a child and assessed a twenty-year determinate sentence. He was subsequently transferred to the Texas Department of Corrections, where he remains incarcerated. M.P.A. filed an application for writ of habeas corpus seeking release from incarceration on grounds of actual innocence and ineffective assistance of counsel during his delinquency hearing. In the alternative, M.P.A. sought a new disposition hearing on grounds that a key State expert testified falsely and that his counsel had been ineffective in addressing the expert's false testimony. Following an evidentiary hearing, the district court denied M.P.A.'s application. M.P.A. appeals, contending that the district court abused its discretion in denying relief with respect to each of his four habeas claims. We will affirm the district court's order.

## BACKGROUND

The underlying facts have been the subject of three prior proceedings in this Court, two of which involved appellant M.P.A. and one that involved M.P.A.'s older brother, J.W.A. *See*

*In re M.P.A.*, No. 03-00-00211-CV, 2000 Tex. App. LEXIS 8027 (Tex. App.—Austin Nov. 30, 2000, no pet.); *In re M.P.A.*, No. 03-02-00068-CV, 2002 Tex. App. LEXIS 8952 (Tex. App.—Austin Dec. 19, 2002, pet. denied); *In re J.W.A.*, No. 03-03-00464-CV, 2005 Tex. App. LEXIS 8435 (Tex. App.—Austin Oct. 13, 2005, no pet.).  The underlying facts center on allegations that, on or around May 1, 1997, M.P.A., then fourteen years of age, and J.W.A., then fifteen, sexually assaulted two cousins, S.A., a girl, then seven, and her younger brother A.A., then five.  The cousins are related through their fathers—the father of S.A. and A.A., Stephan Arena, is the brother of M.P.A. and J.W.A.'s father, Robert Arena.  The two brothers, with their respective children, lived in Harker Heights, as did the men's mother, the common paternal grandmother to their children. Robert,[1] M.P.A. and J.W.A.'s household also included Robert's wife and the children's mother, Betty Arena. However, by the time of the alleged assaults, S.A. and A.A.'s mother and Stephan's wife, LaVonna Arena, had moved out of the family home and filed for divorce.  Around May 16, 1997, LaVonna left Texas with S.A. and A.A., in violation of a custody arrangement, moving first to Florida and, in November 1997, to a city in Iowa where her mother lived.  There is conflicting evidence as to exactly when the children first made an outcry of sexual abuse, but it was a report made to Iowa authorities in 1998 that ultimately led Bell County authorities to investigate.

During the investigation, J.W.A. signed two written statements (an initial handwritten statement and a signed typewritten statement) in which he confessed to having oral sex with S.A. As for A.A., J.W.A. indicated in his handwritten statement that he did not remember any conduct with that child, but later denied such conduct in his typewritten statement.  Ultimately, both M.P.A.

---

[1] Given the common surname of these relatives, we will often identify them by first names for clarity.

and J.W.A. were charged with three counts of aggravated sexual assault of a child. Against M.P.A., it was alleged in count one that on or about May 1, 1997, he had sexually assaulted S.A. by causing her mouth to contact his sexual organ; in count two, by causing S.A.'s sexual organ to contact his sexual organ; and in count three, by causing A.A.'s anus to contact his sexual organ. Against J.W.A., it was alleged in count one that he had sexually assaulted S.A. by causing her mouth to contact his sexual organ; in count two, by causing S.A.'s sexual organ to contact his sexual organ; and in count three, by causing A.A.'s mouth to contact J.W.A.'s sexual organ.

On October 6, 1999, pursuant to a plea bargain, J.W.A. pled true to the allegations regarding conduct with S.A. and received a determinate sentence of seven years.[2] M.P.A., on the other hand, pled not true to the charges against him. A few days after J.W.A.'s adjudication, M.P.A.'s case proceeded to jury trial before the Honorable Edward S. Johnson, the presiding judge of the Bell County Court-at-Law Number 1, sitting as a juvenile court.

**M.P.A.'s adjudication**

The State's case against M.P.A. rested primarily upon the testimony of S.A. and A.A.; Alice Lindner, a sexual assault nurse examiner (SANE) at Scott & White, who had examined both S.A. and A.A. in June 1999; and Dr. Pamela Green, an obstetrician and gynecologist (OB/GYN) who had reviewed S.A.'s and A.A.'s medical records from Nurse Lindner's sexual assault exams.

---

[2] A determinate sentence is one in which the term of commitment begins in the custody of the Texas Youth Commission (TYC) with a possible transfer to the Institutional Division of the Texas Department of Criminal Justice (TDCJ). *See* Tex. Fam. Code Ann. § 54.04(d)(3) (West 2008) (providing for determinate sentencing); *see also id*. § 53.045(a)(5) (West 2008) (listing aggravated sexual assault as offense for which determinate sentence may be assessed).

By the time of trial, S.A. was nine years of age and was still living with her mother, LaVonna, in Iowa. While somewhat equivocal or inconsistent regarding precisely when, where, and how often specific incidents occurred and who might have been present, S.A. testified, on leading questions by the State, that M.P.A. had made her place her mouth on his "private parts" and had caused his "private parts" to contact hers on more than one occasion at her house, his house, and/or their grandmother's house. She gave a similar account during cross-examination.

The State next presented A.A. As of the time of trial, A.A. had just turned eight years old. In the interim, A.A. had moved back to Harker Heights, where he was living with his father, Stephan. Although the State was unable to elicit testimony from A.A. concerning the specific acts it had alleged M.P.A. had committed, A.A. did testify that, on one occasion, he was in a room at his house with S.A. and M.P.A. when M.P.A. told S.A. to "suck my thing." According to A.A., S.A. complied.

The next witness was the SANE nurse, Alice Lindner. Lindner explained that as part of the sexual assault examinations she had performed on S.A. and A.A.,[3] she asked the children questions about what had happened to them. Over hearsay objections by defense counsel, Lindner testified that S.A. told her that "[M.P.A.] and [J.W.A.], they put their privates in my butt," and that A.A. told her that "[M.P.A.] and [J.W.A.] have been making me suck their privates."

The final witness to testify for the State at the delinquency portion of the trial was Dr. Pamela Green, the OB/GYN. Having reviewed the records from Nurse Lindner's exams, Dr. Green testified that a rectal exam was performed on A.A., and that his "rectum appeared

---

[3] The medical records of the examinations were admitted into evidence at trial. However, it does not appear that the medical records were included in the record from the writ hearing.

normal." Regarding the results of S.A.'s exams, Green also testified that "the rectal exam was normal." The vaginal exam revealed that S.A. had a "posterior rim hymen," which Green testified was "very common" in girls. However, Green was concerned with the fact that, in her words, the hymen "was very scant. It was only about a millimeter." According to Green, this "scant hymen," while not alone conclusive proof of penetration, was nonetheless "consistent" with and "a suspicious finding for possible vaginal penetration." After Green testified, the State rested its case.

The only witness for the defense was M.P.A. M.P.A. denied the allegations against him and testified that he had never been alone with S.A.

The trial court granted a defense motion for directed verdict to the third count (the count alleging that M.P.A. had sexually assaulted A.A.) but submitted the other two counts (pertaining to S.A.) to the jury. The jury found that M.P.A. had committed both of the remaining two counts of sexual assault.

The jury then heard evidence regarding disposition. The State presented two witnesses. First, it called Dr. Frederick Willoughby, a licensed psychologist and registered sex offender treatment provider, who was presented as an expert "in the area of sex offender assessment and treatment." Willoughby had performed a court-ordered psychological evaluation on M.P.A. in advance of trial, including the administration of an "Abel Assessment." According to Willoughby, the Abel Assessment entailed a "subjective" component in which the subject answers a series of yes-or-no questions and an "objective" component in which the subject views images of males and females in different age categories on a computer. The subject's "response time, how long they look at the slides of the males and the females in different age categories" is measured,

Willoughby explained, and from this data the subject's level of sexual interest in the different age and gender categories can be determined.

Prior to his testimony before the jury, M.P.A.'s trial counsel, Bobby Barina, conducted a voir dire examination and asked a series of questions relevant to the non-exclusive factors bearing on the reliability of scientific evidence identified by the court of criminal appeals in *Kelly v. State*, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992). Following this exchange, Barina objected to the admission of Dr. Willoughby's opinions derived from the Abel Assessment results on grounds that the test was unreliable because its rate of error in detecting sexual interest in girls under the age of 14 was, according to Willoughby, as high as 15 percent. The trial court overruled the objection. Before the jury, and over the re-urged objection of Barina, Willoughby opined that based on the results of the objective component of the Abel Assessment administered to M.P.A., M.P.A. had "displayed significant sexual interest in eight to ten year-old females and two to four and eight to ten year-old males." Willoughby added that "[b]ased on the results of the Abel Assessment and the incidents that took place," he would consider M.P.A. a "pedophile" who would require intensive and long-term treatment to overcome his sexual attraction to children.

After Willoughby, the State called Kathie Lewis, a Bell County probation officer, who opined that probation and home supervision would not be appropriate for M.P.A. The sole witness for the defense was M.P.A.'s mother, Betty, who urged the jury to consider probation for her son and insisted that she would supervise him regardless of her personal beliefs about whether he had committed the offenses.

During closing arguments, the State repeatedly emphasized the theme that M.P.A.'s status as an expert-diagnosed "pedophile" with a "high risk to reoffend" necessitated a lengthy

incarceration rather than probation. Following closing arguments, the record of the disposition hearing reflects that, after "a long recess," the jury—whose punishment options had ranged from probation to forty years' confinement—returned with their verdict of twenty years' commitment to TYC. M.P.A. was eventually transferred to TDCJ to serve the remainder of his sentence, where he remains.

M.P.A. brought a direct appeal from his adjudication. He argued that the trial court committed reversible error in excluding evidence relating to the alleged bias and motive of the victims (including matters relating to the ongoing divorce and custody disputes between Stephan and LaVonna Arena) and in admitting evidence of the victim's statements through Nurse Lindner. Finding no abuse of discretion in the trial court's challenged evidentiary rulings, this Court affirmed the judgment. *M.P.A.*, 2000 Tex. App. LEXIS 8027, at *4-13.

**The present proceeding**

In March 2007, M.P.A. filed an application for writ of habeas corpus in Bell County's 169th district court. Invoking the district court's plenary jurisdiction under Article V, Section 8 of the Texas Constitution,[4] M.P.A. asserted four constitutional claims that, he insisted, were unavailable to him during his adjudication and direct appeal. First, relying on "newly discovered evidence"—chiefly, purported recantations of both S.A. and A.A.—M.P.A. asserted that he is actually innocent of sexually assaulting S.A. Second, M.P.A. asserted that his trial counsel was

---

[4] *See* Tex. Const. art. V, § 8 ("District Court jurisdiction consists of exclusive, appellate, and original jurisdiction of all actions, proceedings, and remedies, except in cases where exclusive, appellate, or original jurisdiction may be conferred by this Constitution or other law on some other court, tribunal, or administrative body. District Court judges shall have the power to issue writs necessary to enforce their jurisdiction.").

7

ineffective in failing to investigate and present evidence to counter the State's evidence of his guilt.

Third, relying on "new evidence" that Willoughby had signed an agreed order of the Texas State Board of Examiners of Psychologists in 2003 admitting that he "misstated in his court testimony the research that had been conducted with respect to the Abel Assessment" and accepted disciplinary sanctions, M.P.A. sought a new disposition hearing on the ground that Willoughby had committed "perjury"in his voir dire testimony relevant to the reliability of the Abel Assessment. Relatedly, in his fourth claim, M.P.A. asserted that his trial counsel was ineffective in failing to investigate the reliability of the Abel Assessment sufficiently, or to consult or present his own expert, to enable him to counter Willoughby's misstatement during voir dire and prevent his opinions from being admitted. Moreover, M.P.A. complained, his trial counsel was ineffective in failing to present an expert to attack Willoughby's reliance on the test before the jury.

In support of his claims, M.P.A. attached documentary evidence and the reporter's records from both his trial and a 2001 bill-of-review proceeding in which he had unsuccessfully attempted to challenge his adjudication. *See M.P.A.*, 2002 Tex. App. LEXIS 8952.[5]

---

[5] The State emphasizes that M.P.A. had previously pursued a bill of review without success, as well as filing an abortive habeas petition under code of criminal procedure article 11.07 in the juvenile court, *see Ex parte Valle*, 104 S.W.3d 888, 889-90 (Tex. Crim. App. 2003) (juvenile adjudication is not a "final conviction" from which habeas relief is available under article 11.07), and an unsuccessful federal habeas proceeding. While criticizing M.P.A.'s multiple "bites at the apple," the State does not contend on appeal that any of M.P.A.'s current habeas claims are barred by virtue of his raising or failing to raise his present claims in prior proceedings. Consequently, we do not belabor this procedural history except to the extent that evidence presented in the bill-of-review proceeding is relevant to our analysis of M.P.A.'s present claims. We note, however, that M.P.A.'s brother, J.W.A., relying primarily on the record from M.P.A.'s bill-of-review proceeding, previously sought habeas relief in the district court based on a claim of actual innocence. The district court denied relief without a hearing, and we affirmed this judgment on appeal. *See In re J.W.A.*, No. 03-03-00464-CV, 2005 Tex. App. LEXIS 8435 (Tex. App.—Austin Oct. 13, 2005, no pet.) (mem. op.).

The district court also held an evidentiary hearing. We will discuss this evidentiary record as it is relevant to our analysis of M.P.A.'s issues on appeal.

Following the hearing, the district court took the matter under advisement and ultimately denied M.P.A.'s application. It subsequently entered findings of fact and conclusions of law. This appeal followed.

## ANALYSIS

M.P.A. brings four issues on appeal that correspond to his four claims for habeas relief. M.P.A. complains that the district court abused its discretion in failing to grant relief based on, first, his claim of actual innocence; second, his claim of ineffective assistance of counsel during the delinquency hearing; third, his claim that Dr. Willoughby committed "perjury" during the disposition hearing; and fourth, his claim of ineffective assistance of counsel during disposition. M.P.A. prays that we sustain either or both of his first two issues, reverse the district court's judgment, and render judgment releasing him from confinement. In the alternative, M.P.A. urges that we sustain either or both of his third and fourth issues, reverse the district court's judgment, and order the juvenile court to hold a new punishment hearing.

### Standard of review

Absent a clear abuse of discretion, we must affirm a trial court's decision on whether to grant the relief requested in a habeas corpus application. *See Ex parte Karlson*, 282 S.W.3d 118, 127 (Tex. App.—Fort Worth 2009, pet. ref'd). We are to evaluate whether the trial court acted without reference to any guiding rules or principles. *Ex parte Wolf*, 296 S.W.3d 160, 166 (Tex. App.—Houston [14th Dist.] 2009, pet. ref'd). In reviewing the trial court's decision, we view

9

the evidence in the light most favorable to the court's ruling. *Ex parte Wheeler*, 203 S.W.3d 317, 324 (Tex. Crim. App. 2006). In conducting our review, we must be mindful that the trial court, as fact finder at the habeas hearing, is the exclusive judge of the credibility of the witnesses. *See Ex parte Amezquita*, 223 S.W.3d 363, 367 (Tex. Crim. App. 2006). Thus, we afford almost total deference to the trial court's determination of the historical facts that are supported by the record. *Id*. at 367. We afford the same amount of deference to the trial court's application of the law to the facts, to the extent that the resolution of the ultimate question turns on an evaluation of credibility and demeanor. *Ex parte Peterson*, 117 S.W.3d 804, 819 (Tex. Crim. App. 2003) (per curiam), *overruled in part on other grounds by Ex parte Lewis*, 219 S.W.3d 335, 371 (Tex. Crim. App. 2007). If the resolution of the ultimate questions turns on an application of legal standards, however, we review the determination de novo. *Id*.

Although the decisions of the court of criminal appeals in habeas proceedings provide us some guidance, we must also be mindful that our jurisdiction in this proceeding is narrower than that exercised by the high criminal court in the otherwise analogous context of its post-conviction review of habeas corpus applications in criminal cases. In those proceedings, the court of criminal appeals has broad original jurisdiction to issue the writ and acts as the "ultimate factfinder," with power to "make contrary or alternative findings and conclusions" in derogation of the trial court's findings and conclusions. *See Ex parte Reed*, 271 S.W.3d 698, 727 (Tex. Crim. App. 2008). By contrast, we lack original jurisdiction to issue the writ of habeas corpus except in narrow circumstances not present here. *See* Tex. Const. art. V., § 6 (courts of appeals "shall have such other jurisdiction, original and appellate, as may be prescribed by law"); Tex. Gov't Code Ann. § 22.221(d) (courts of appeals or its justices, concurrently with Texas Supreme Court and its justices,

have original jurisdiction to issue writ of habeas corpus "when it appears that the restraint of liberty is by virtue of an order, process, or commitment issued by a court or judge because of the violation of an order, judgment, or decree previously made"); *Ex parte Hofmayer*, 420 S.W.2d 137, 138 (Tex. 1967) (original habeas jurisdiction did not extend to restraint of juvenile allegedly in violation of due process). We do not act as a factfinder, but possess solely appellate jurisdiction to review the district court's order and its underlying fact findings and conclusions to determine whether they are supported by the record.

**Actual innocence**

M.P.A. asserts that "new evidence" that became available after trial establishes that he is actually innocent of the sexual-assault charges on which he was adjudicated delinquent. This type of claim is known as a "bare" innocence or *Herrera*-type claim—it is predicated not on the existence of any constitutional defect in the trial process that yielded a defendant's conviction, but on the claim that the defendant is actually innocent, as demonstrated by new evidence discovered or made available since trial. *See Herrera v. Collins*, 506 U.S. 390 (1993); *Ex parte Franklin*, 72 S.W.3d 671, 675 (Tex. Crim. App. 2002) (citing *Schlup v. Delo*, 513 U.S. 298, 314 (1995); *Ex parte Elizondo*, 947 S.W.2d 202, 208 (Tex. Crim. App. 1996)). Because the incarceration of a truly innocent person would in itself violate due process, actual innocence is an independent ground for habeas corpus relief under those circumstances. *See Elizondo*, 947 S.W.2d at 204-05.

A bare innocence claim turns not on whether the jury's verdict was valid, but on whether the new evidence would have convinced the jury of the applicant's innocence. *See id.* at 207, 209. "[T]he court charged with deciding such a claim should make a case-by-case

11

determination about the reliability of the newly discovered evidence under the circumstances, . . . then should weigh the evidence in favor of the [applicant] against the evidence of his guilt" adduced at trial, *id*. at 207 (quoting *Herrera*, 506 U.S. at 244 (Blackmun, J., dissenting)), and "assess the probable impact of the newly available evidence upon the persuasiveness of the State's case as a whole." *Id*. at 206. Ultimately, the applicant must meet the "extraordinarily high" burden of proving "by clear and convincing evidence that no reasonable juror would have convicted him in light of the new evidence." *See id*. at 209.

M.P.A. argues that he presented "new evidence" that established, by clear and convincing evidence, that he never sexually assaulted S.A. This evidence may be summarized as falling into essentially three categories. First, M.P.A. has relied on subsequent recantations of both S.A. and A.A.—both now deny ever being sexually abused by either cousin. They explain their earlier accusations against M.P.A. and J.W.A. as the product of manipulation by their mother, LaVonna. With this testimony, M.P.A. presented, second, evidence that LaVonna had the motive and capacity to fabricate false sexual-assault allegations by her children as a means of gaining advantage in her custody battle with Stephan, with whom the children had been living at the time of the alleged incidents. Third, M.P.A. relies on what he terms "an enormous amount of evidence corroborating the recantations," including evidence regarding the timing of the children's alleged outcries (or absence thereof) compared to events in LaVonna's divorce and custody battles with Stephan, LaVonna's potential involvement in inducing or encouraging the outcries, and medical evidence.

S.A. testified at both the bill-of-review hearing and the habeas hearing. At the time of the bill-of-review hearing, S.A. was age eleven and living with Stephan and A.A. After receiving

12

warnings from the juvenile court regarding the implications of providing perjured testimony, S.A. testified that her prior testimony at M.P.A.'s trial had not been true, that "my mom [LaVonna] told me to say those things" and that LaVonna would go to jail if she did not. Later, at the habeas hearing before the district court, S.A., now within a few days of her eighteenth birthday, elaborated that LaVonna first began insisting that she accuse her cousins of sexually assaulting her while in Florida, after LaVonna had fled Texas with the children in violation of a court order, and that LaVonna told her that this was necessary to keep LaVonna out of jail. S.A. acknowledged that when she traveled to Texas to testify in M.P.A.'s trial, she had been accompanied by her maternal grandmother while LaVonna had remained in Iowa. While LaVonna had not been physically present to influence her, S.A. insisted that, nonetheless, "when I go home I'm going home to my mom."

A.A. also testified during the habeas hearing. He denied that either cousin had sexually assaulted him. A.A. testified to a conversation with LaVonna, his maternal grandmother, and S.A. after they had moved to Iowa when he was six or seven years old. According to A.A., LaVonna told him to say that his cousins had sexually assaulted him. A.A. claimed he complied and later testified against M.P.A. at trial despite his reservations that "this isn't really true" because he thought "I shouldn't question my mother, you know, because she is my mother and she's got wisdom."

M.P.A. presented evidence during both hearings tending to show that LaVonna had a poor propensity for truthfulness, a pattern of using abuse allegations to gain leverage in domestic disputes, including her disputes with Stephan, and that the timing of these allegations had tended to coincide with key events in their dispute. This included proof that LaVonna had made an allegation of sexual abuse against an ex-husband to whom she had been married prior to her marriage to

13

Stephan. LaVonna purportedly accused him of sexually abusing their daughter, V.P., S.A. and A.A.'s half-sister. Charges against the ex-husband were later dismissed.

According to Stephan, who testified at both hearings, he first heard about the children's sexual-abuse allegations against M.P.A. and J.W.A. after LaVonna had fled Texas with the children, and he filed charges against her for interference with child custody. Within "a matter of days" thereafter, Stephan testified, his divorce attorney (who had received a call from LaVonna's divorce attorney) advised him "that LaVonna said that she wouldn't come back to Texas or bring the kids back to Texas because [J.W.A.] and [M.P.A.] had been sexually assaulting" S.A. and A.A.

Stephan explained that after he had ascertained that LaVonna and the children were living in Iowa, he initiated custody proceedings in that state. According to Stephan, the resulting custody arrangement provided that LaVonna would get temporary custody of the children until Kris Weis, an Iowa social worker, prepared a custody report. "And when her report was finished," Stephan testified, "me and the kids and LaVonna had agreed that [S.A.] would stay with LaVonna and [A.A.] would come to Texas with me." It was during this period that the children made the outcries that triggered the criminal proceedings against M.P.A. and J.W.A. in Bell County.

Stephan subsequently attempted to obtain custody of S.A. after she visited him during the summer of 2000 "and told me about the drug use and the abuse in LaVonna's household." Stephan claims he also learned that LaVonna had been cohabitating with two sex offenders, prompting him to have S.A. physically examined. According to Stephan, after he tried to gain custody of S.A., LaVonna accused him, M.P.A., and J.W.A. of sexually assaulting their children. At the time these acts allegedly occurred, M.P.A. and J.W.A. were incarcerated.

14

M.P.A. also presented testimony from a friend of Stephan's and an acquaintance of LaVonna's. The friend testified that she had encountered LaVonna around the time she had filed for divorce. The friend recounted that LaVonna was upset and told her that "Stevie wasn't going to get the kids and she would do whatever she had to do in order for him not to get them." Similarly, another acquaintance of the Arenas testified that she had a conversation with LaVonna in May 1997 during which LaVonna "told me specifically that she, one way or another that she would have custody of her children and that the Arenas would pay for the way they had treated her; those were her exact words."

In addition, M.P.A. presented LaVonna's deposition and trial testimony from a federal court lawsuit related to these events that tended to demonstrate that she had made numerous false statements to authorities concerning such matters as when she had first reported the alleged abuse to authorities, how she had discovered the alleged abuse, and why she had fled Texas with the children (including her admission that she had stolen money from her employer shortly before departing). M.P.A. even provided an affidavit from LaVonna's own sister, who "hereby state[d] categorically that [LaVonna] is a pathological liar and would do anything to gain an advantage in a custody proceeding, including lying about sexual abuse concerning her children."

M.P.A. also presented testimony from Dr. Stuart Coles, the pediatrician at Scott & White who had examined S.A. in 2000 at Stephan's request to determine whether she had been abused while living with her mother in Iowa. Coles determined that S.A.'s "hymenal structure appear[ed] normal." Coles added that during the exam, S.A. "denied that she'd been inappropriately touched by anyone." Likewise, Arlene Stoddard, a licensed professional counselor who saw Stephan, S.A., and A.A. in 2000 and 2001, reported that by this time [S.A.] had recanted her sexual

15

abuse allegations against her cousins and "admitted that her biological mother influenced her to make statements about the abuse."

As evidence further supporting his position that S.A. and A.A. were never abused, M.P.A. points to statements in the report of Kris Weis, the Iowa social worker, that she was "very confused" about the children's sexual-abuse allegations and had reservations about whether the children were being truthful in their responses to her questions. Also, Adair Pickard, a social worker with Catholic Charities, who had counseled the children during their time in Florida in 1997, stated in a letter she later wrote in 2000 that "[e]ach child denied abuse and no definitive indicators were noted." Additionally, an Iowa police detective who interviewed the children reported that S.A. refused to discuss the abuse without her mother present and indicated that she wanted to "practice with her mom by having her mom ask her the questions." The detective was "concerned that [S.A.] could be coached by her mother and did not want her mother in the room during the interview." Furthermore, M.P.A. also elicited testimony from the SANE nurse who had examined S.A. previously, Alice Lindner, tending to show that there were disagreements among the medical team regarding their findings.

Other key evidence presented by M.P.A. included the testimony of a caseworker with the Texas Youth Commission, who testified during the bill-of-review hearing that M.P.A. had refused to admit that he had committed the offenses for which he had been adjudicated delinquent, and the testimony of J.W.A., who by now had been paroled and appeared live at the habeas hearing. J.W.A. denied sexually abusing either cousin and attempted to explain why he had given two written confessions to authorities and pled true if he had been innocent. Both of J.W.A.'s written statements (one handwritten and one typewritten) were admitted into evidence at the habeas hearing. In both

16

statements, J.W.A. admitted to sexual conduct with S.A.  In his handwritten statement, J.W.A. professed to not remember any conduct with A.A., while in his typewritten statement he claimed that he had "never done anything" with A.A.  Near the end of the typewritten statement, J.W.A. stated, "I don't remember my brother doing anything."  The record of J.W.A.'s judicial confession was also admitted into evidence.

J.W.A. claimed he was "confused" at the time of his plea and that his attorney did not explain to him what was happening during the proceedings.  J.W.A. also asserted that he was "made" to write and sign his confessions because he was not allowed to leave the office of the investigating Harker Heights police detective, Erika Jordan, until he had provided her with a written statement.[6]

In response, the State attacked the credibility and reliability of S.A. and A.A.'s recantations.  While making little attempt to defend the credibility or character of LaVonna, the State presented evidence tending to indicate that Stephan—S.A. and A.A.'s father and biological uncle to M.P.A. and J.W.A.—himself manipulated and pressured his children to recant, both directly and through the involvement of Loretta Matthews, a self-styled "evidence researcher" who was assisting Stephan in his battles with LaVonna.  The State suggested that the timing and circumstances of the recantations tended to show that it was these claims, not the original outcries of sexual abuse, that were the product of manipulation and pressure.

---

[6] There was also evidence presented at the habeas hearing concerning the results of a polygraph examination that J.W.A. had taken when he was released on parole.  However, "references to a polygraph test, or to its results, are inadmissible for all purposes." *Martinez v. State*, 272 S.W.3d 615, 626 (Tex. Crim. App. 2008).  The State timely objected to the admission of this evidence, and we will not consider it in our analysis.

The State elicited considerable evidence regarding Matthews's contacts with and potential influence upon the children in the months leading up to the recantations. It called Matthews as a witness during the bill-of-review proceedings. Matthews testified that she had met the Arena family during the spring of 2000 and was hired by Stephan in the summer of 2000. Matthews denied that she was hired in anticipation of a custody dispute. According to Matthews, her involvement in the case "started out as employment and then it turned into [] volunteer" work. She ultimately volunteered because, in her words, one, "Mr. Arena could not afford" her services, and two, "this case was important enough to volunteer my time." When asked what exactly she did for Mr. Arena, Matthews testified, "At first he wanted to find out why his children's statements were so inconsistent." Matthews added that she was referring to the allegations made against J.W.A. and M.P.A. and also the allegations of abuse in Iowa.

Matthews denied influencing either S.A. or A.A. to recant. Rather, Matthews testified that in July 2000 she had administered "scan questionnaires"[7] to S.A. and A.A. concerning their accusations. Matthews recalled that A.A. wrote on his questionnaire that he had lied about what M.P.A. and J.W.A. did to him. S.A. did not recant on the questionnaire. However, in June 2001, during an argument with Lisa Jalbert, Stephan's girlfriend and later wife, S.A. made an initial recantation. Later that day, Matthews testified, she coincidentally happened to go to Stephan's house "to give him documentation." According to Matthews, "Mr. Arena asked me to stay because he wanted to have a witness concerning that he needed to confront his daughter about something

[7] Matthews was unclear in her testimony about the nature of this "scan questionnaire." The State could elicit only the following explanation from Matthews: "A scan questionnaire is a—I'm sorry, I went blank. A scan questionnaire relies on the person's statement, not the subject. The subject comes in the statement."

18

that she told Lisa [Jalbert]." In the presence of her father and Matthews, S.A. admitted "that she lied about [M.P.A.] and [J.W.A.]." Matthews then asked S.A., "Why did you lie?" Matthews testified, "And that is when she stated, 'Because my mom told me to.'"

The State also elicited testimony from Matthews concerning her personal beliefs regarding allegations of sexual abuse. Matthews had written a letter to Police Chief Mike Gentry of the Harker Heights Police Department in which she had characterized false allegations of sexual abuse as "the witchhunt of the 20th century." The letter concerned an allegation of sexual abuse that had been made by Matthews's stepdaughter against Matthews's husband.

S.A., A.A., and Stephan were all asked about Matthews's involvement during their testimony. When asked if Matthews had pressured her to recant, S.A. stated, "It was more like encouragement." A.A. similarly acknowledged that he had met with Matthews a "few" times and that, while denying that she had encouraged him to recant, indicated that "[s]he just wanted the truth regardless what it was." As for Stephan, he denied asking Matthews to convince the children to change their stories. Stephan claimed that he had merely "financed her trip" to Iowa to investigate LaVonna for purposes of the custody proceedings. When asked why Matthews had continued to meet with S.A. and A.A. even after the custody proceedings in Iowa had ended, Stephan testified, "Just general visit, see how they were doing, how they were getting along." Stephan also acknowledged that Matthews had been involved on his brother's behalf in investigating the original allegations of abuse against M.P.A. and J.W.A.

The State also emphasized evidence that by the time they recanted, both S.A. and A.A. were living with Stephan. S.A. and A.A. also testified that their relationship with Stephan was much more favorable than their relationship with LaVonna. While each testified that they loved

19

their father and had a good relationship with him (S.A. adding that she had "always been somewhat a daddy's little girl"), A.A. stated that he hated his mother "[a] little bit" and S.A., while denying that she hated or particularly disliked her mother, stated that "I don't particularly like her either." There was also evidence tending to show that the children's relationship with M.P.A. and J.W.A.'s parents, uncle Robert and aunt Betty, could have provided a motive to recant. S.A. was aware that Robert and his wife "lost their business, they lost their house, all in an effort to pay for [M.P.A.]'s trial." When asked if "all of this trouble" Robert and his wife were going through was difficult on her father, S.A. testified, "I think anyone would be generally upset about that. And yes, my dad was somewhat upset." S.A. further testified that, after she had returned to Texas to live with her father, she would see Robert and his wife "maybe once or twice a month" and that they would visit her family during Christmas and give gifts to her and her siblings. S.A. admitted that when she saw Robert and his wife, she would feel bad about her cousins being incarcerated.

Additionally, S.A. testified that before recanting, her allegations had created tension with her father's girlfriend and future stepmother, Lisa Jalbert. In fact, S.A. acknowledged that she had first recanted in response to Jalbert's accusations that S.A. was a liar who put people in jail.

The lead prosecutor during the adjudication trial and the bill-of-review hearing, Thomas Seigman, testified that he had several meetings with S.A. and A.A. prior to trial. Regarding his meetings with S.A., Seigman did not recall anything that gave him reason to think that she was not being completely honest with him about everything. According to Seigman, "Every time I spoke with her she didn't waver. She told me what had happened, and she never told me that it didn't happen." In an affidavit, the other prosecutor during trial, Jeanne Parker, similarly concluded that S.A. was a credible witness.

20

As for M.P.A.'s evidence from health care providers and counselors, the State argued that while Weis, the Iowa social worker, had termed the children's abuse allegations "confusing," she also concluded in her report that "I believe that both children were likely sexually abused by their cousins in Texas," and that, "While they did not report this to Catholic Social Service counselors [in Florida], that is not unusual. And both children state that those counselors did not ask them about any abuse." Similarly, the Iowa police detective who had expressed concerns about LaVonna possibly coaching S.A. ultimately concluded that both children were victims of abuse. The State also emphasized that the offenses for which M.P.A. and J.W.A. had been adjudicated delinquent did not require vaginal penetration.

Finally, the State was able to challenge the reliability of the recantations through evidence regarding the original investigation (including police investigative files that recount considerably more detailed allegations by S.A. and A.A. than they later presented at trial) and J.W.A.'s written confessions and plea, all of which contradicted the recanting witnesses' claims that no abuse had occurred. The State countered J.W.A.'s assertions regarding his confessions with testimony from Michael White, J.W.A.'s trial counsel, who averred, "I was aware of the confession of my client and I was present when he confessed. I had no reason to believe, nor do I believe today, that any part of the confession was not truthful." White also testified at the habeas hearing. He indicated that J.W.A. "made specific, detailed admissions regarding [A.A.]" and "general admissions regarding [S.A.]" outside the presence of his father but would never admit to those acts in his presence. White added that J.W.A., in his view, "[a]bsolutely" pled guilty knowingly and voluntarily, adding, "He wanted to avoid his father knowing what he had done with [A.A.]."

21

In addition to the foregoing evidence, the record before the district court included the juvenile court's findings of fact and conclusions of law from the bill-of-review proceeding. The juvenile court, which heard the live testimony of S.A., Stephan, and Matthews, found that "S.A., while in the custody of her mother, was subject to manipulation as to the context of her trial testimony," but also that "S.A., while in the custody of her father during the Bill of Review proceedings, was likewise subject to her father's manipulation individually, and through his 'investigator,' Loretta Matthews." It further found that "S.A.'s 'outcry' and testimony as to the sexual assault were corroborated by objective medical evidence of 'hymenal alteration' as testified to by Dr. Pamela Green, as well as Alice Lindner, R.N. (a sexual assault nurse examiner), in the original trial proceedings." The juvenile court also found that "Loretta Matthews was not a qualified 'expert' witness as to any matter about which she testified."

The district court made the following fact finding pertinent to M.P.A.'s actual innocence claim: "The testimony of [S.A.] and [A.A.] in their recantations of prior testimony was not credible, based on the testimony of all the witnesses, confessions or admissions of [J.W.A.], and other evidence." Based on that finding, the district court concluded that M.P.A. "failed to meet his burden of proof and did not show by clear and convincing evidence that no rational trier of fact could have found the applicant guilty beyond a reasonable doubt."

On appeal, M.P.A. attacks the district court's finding and conclusion in two basic ways. First, M.P.A. asserts that the finding demonstrates that the district court erred by considering not only "the evidence of guilt adduced at trial," but also "new allegedly inculpatory evidence, such as the 'confessions or admissions of [J.W.A.]' that were not introduced at trial." We disagree that the district court's references to J.W.A.'s confessions demonstrates error. The finding is consistent

22

with the district court having considered all of the evidence in the record in making its determination as to whether the recanting witnesses were credible. The credibility of the recanting witnesses bears directly on the persuasiveness of the newly discovered evidence, which was at the heart of the district court's inquiry. *See Elizondo*, 947 S.W.2d at 207 ("'[T]he court charged with deciding [an actual innocence] claim should make a case-by-case determination about the reliability of the newly discovered evidence under the circumstances. The court then should weigh the evidence in favor of the prisoner against the evidence of his guilt. Obviously, the stronger the evidence of the prisoner's guilt, the more persuasive the newly discovered evidence must be.'" (quoting *Herrera*, 506 U.S. at 244 (Blackmun, J., dissenting))).

Second, M.P.A. urges, in essence, that the evidence favoring S.A. and A.A.'s recantation version of the facts is more abundant and persuasive than their original version. As support for his position, M.P.A. cites to two cases that presented facts similar to the facts of this case in which the court of criminal appeals granted habeas relief. In *Ex parte Thompson*, the applicant was convicted of sexually assaulting his five-year-old daughter, who was eight years old at the time of trial. 153 S.W.3d 416, 418 (Tex. Crim. App. 2005). At the habeas hearing, the complainant, now 20 years old, testified that the sexual abuse never happened, but that her mother had pressured her into making the allegations against her father as part of a custody dispute. *Id*. at 419. The complainant's mother also testified at the habeas hearing and admitted to having doubts about whether the applicant had committed the acts for which he had been convicted. *Id*. Additionally, there was testimony that the physical evidence of abuse in the case, a torn dress worn by the complainant at the time of the alleged abuse, which had led the mother to suspect that abuse had occurred, was the result of a fall on a bus and not the result of anything the applicant had done

23

to the complainant. *Id*. Finally, the applicant presented the testimony of Lynn Corsi, "an attorney and licensed Master Social Worker who had worked as an assistant district attorney prosecuting cases of child abuse and neglect and who had founded the Dallas Children's Advocacy Center." Corsi, who had reviewed the transcript and record of applicant's trial, the affidavit and testimony of the complainant, a three-hour interview with the complainant, and the testimony at the habeas hearing, opined that the complainant's recantation was valid and explained in detail the bases for her opinion. *Id*. at 420. The trial court found that the applicant had satisfied his burden of proving his actual innocence and recommended relief. *Id*. The court of criminal appeals found that the trial court's findings were supported by the record and granted relief. *Id*. at 420-21.

In *Ex parte Elizondo*, the applicant was convicted of sexually assaulting his stepsons, who were eight and ten years old at the time the abuse allegedly occurred. 947 S.W.2d at 209-10. The evidence at trial consisted primarily of the testimony of the ten-year-old stepson, which the court of criminal appeals characterized as "perfunctory." *Id*. at 210. More than thirteen years after the trial, the stepsons, who the court of criminal appeals observed were now "grown men," recanted, claiming that the trial testimony was false. *Id*. The stepsons claimed at the habeas hearing "that their natural father relentlessly manipulated and threatened them into making such allegations against applicant in order to retaliate against their natural mother, his ex-wife, for marrying applicant years before." *Id*. In granting relief, the court of criminal appeals explained:

> The habeas court, which had the opportunity to view the witnesses, concluded that [the stepson] had testified falsely at trial. The record supports a finding that the recantation in this case is more credible than the trial testimony was. [The stepson]'s recantation not only voids his trial testimony which implicated applicant, but constitutes affirmative evidence of applicant's innocence. We are convinced

by clear and convincing evidence that no rational jury would convict him in light of the new evidence.

*Id.*

As an initial matter, we observe that the procedural posture of the above cases is different than the case before us. In both *Thompson* and *Elizondo*, the trial court that heard the newly discovered evidence found that the applicant had met his burden of proving actual innocence. The court of criminal appeals, acting on the trial court's recommendation in each case, granted relief. In this case, the habeas court found that M.P.A. had *not* met his burden of proof and denied relief. Thus, M.P.A. is asking us to overturn the habeas court's ruling. Moreover, as previously noted, our jurisdiction to disturb trial-court fact findings is more limited than that of the court of criminal appeals.

Beyond these jurisdictional and procedural differences, there are also key factual distinctions between this case and the cases cited by M.P.A. In *Thompson*, there was much stronger evidence supporting the recantations than exists in this case. Not only did the complainant recant, but the complainant's mother also admitted that she now had doubts about the applicant's guilt. Moreover, the applicant called an expert witness with extensive experience advocating on behalf of abused children who testified in detail why she believed the recantation was credible. In *Elizondo*, although the court's opinion did not provide much detail concerning the facts and circumstances surrounding the recantations, the court of criminal appeals did emphasize that the recanting witnesses were now adults. In this case, in contrast, S.A. first recanted when she was eleven years old, and when she later testified at the habeas hearing, she had not yet turned eighteen. As for A.A., he was only sixteen years old at the time of the habeas hearing. Perhaps more importantly, there was

25

considerable evidence presented in this case tending to show that the recantations themselves may have been the product of pressure applied to the children by their father, the father's family, and the father's "investigator." No comparable evidence was discussed in *Elizondo* or *Thompson*.

As the record reflects, this case arose during a prolonged and bitter custody battle between Stephan and LaVonna Arena. The district court considered the allegations and subsequent recantations made by their children accordingly. Having reviewed the entire record, it is apparent that there is evidence supporting both M.P.A.'s and the State's version of events. In the end, which version to believe turns largely on credibility determinations that the district court, which had the opportunity to observe the recanting witnesses (and their father) in person, was in the best position to assess. We must be mindful that our role here is simply to review the district court's finding and ensure that it is supported by the record. On this record, viewing the above evidence in the light most favorable to the district court's ruling, we cannot conclude that the district court abused its discretion in finding that M.P.A. had not met his "extraordinarily high" burden of proving that no reasonable juror could have convicted him in light of the new evidence. *See Ex parte Brown*, 205 S.W.3d 538, 545 (Tex. Crim. App. 2006) (characterizing applicant's burden to prove actual innocence as "a Herculean task"); *Ex parte Franklin*, 72 S.W.3d at 677 (explaining that when habeas applicant claims actual innocence, applicant bears "the burden of proving his innocence not just raising doubt about his guilt"); *see also Keeter v. State*, 74 S.W.3d 31, 38 (Tex. Crim. App. 2002) (holding that trial court acts within its discretion in denying motion for new trial on basis of recanted testimony "so long as the record provides some basis for disbelieving the testimony. Such bases include, but are not limited to: evidence that the recanting witness was subject to pressure by

26

family members . . . [and] circumstances showing that the complainant recanted after moving in with family members of the defendant").

We overrule M.P.A.'s first issue.

**Ineffective assistance of counsel at delinquency hearing**

In his second issue, M.P.A. urges that the district court abused its discretion in refusing habeas relief based on ineffective assistance during the delinquency hearing. To obtain habeas corpus relief for ineffective assistance of counsel under the *Strickland v. Washington*, 466 U.S. 668 (1984), standards, applicant must show that counsel's performance "was deficient and that a probability exists, sufficient to undermine our confidence in the result, that the outcome would have been different but for counsel['s] deficient performance." *Amezquita*, 223 S.W.3d at 366 (quoting *Ex parte White*, 160 S.W.3d 46, 49 (Tex. Crim. App. 2004)). Counsel's performance is deficient if it is shown to have fallen below an objective standard of reasonableness. *Strickland*, 466 U.S. at 687-88. Prejudice to the applicant from counsel's deficient performance is judged by "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Ex parte Chandler*, 182 S.W.3d 350, 353 (Tex. Crim. App. 2005) (quoting *Strickland*, 466 U.S. at 686).

M.P.A. insists that his trial counsel, Bobby Barina, was ineffective during the delinquency hearing by (1) failing to interview and call as a witness Adair Pickard, the counselor for Catholic Charities in Florida who, in 2000, allegedly wrote a letter to Stephan that during therapy sessions in 1997, the children "denied abuse and no definitive indicators [of abuse] were noted"; (2) failing to introduce evidence that during her videotaped interview with Kris Weis, "[S.A.]

27

became very anxious and said that she couldn't continue because she needed to talk to her mother"; and (3) failing to refute Dr. Green's expert testimony. In regard to M.P.A.'s ineffective-assistance claims,[8] the district court found that "[t]he evidence presented to this Court indicated that the actions of Bobby Barina during the trial of [M.P.A.] were based on sound and legitimate trial strategy. Applicant's trial attorney performed sufficient trial preparation and investigation into the facts of the case, and all decisions regarding evidence presented were sufficiently explained and shown to be sound trial strategy." In light of these findings, the district court concluded that "based on the facts available to Applicant's trial counsel at the time of trial that his actions and decisions were based on legitimate trial strategy, and the trial preparation of Applicant's trial counsel was adequate and within the bounds of reasonably effective representation," and that "Applicant received a fair and reliable trial."

### *Overview of trial counsel's representation*

Before discussing M.P.A.'s specific allegations against Barina, we think it is instructive to note the circumstances surrounding Barina's representation at the time of trial. As described in detail above, this case involved allegations of sexual assault of two young children by their two teenaged cousins on multiple occasions. Both victims testified at trial. Additionally, one of the alleged perpetrators, J.W.A., the brother of Barina's client, had already confessed to sexually assaulting S.A. and had pleaded true to the allegations against him. Although this evidence was not admissible in M.P.A.'s trial, Barina was aware of the confession and guilty plea. Thus, it

---

[8] As noted, M.P.A. also brings an ineffective-assistance claim regarding evidence presented during the disposition hearing.

28

would have been difficult, if not impossible, for Barina to argue in good faith at trial the position that M.P.A. advances currently—that the victims had not been sexually assaulted after all.

Complicating matters even further for Barina were last-minute developments involving J.W.A. Barina testified that prior to trial, his client's family had agreed that J.W.A., who had confessed to and been adjudicated for the offense, would testify that J.W.A. had abused the children and that M.P.A. had not done anything. Combined with the testimony from Dr. Green, which Barina regarded as weak and equivocal, Barina "felt that [J.W.A.]'s testimony might elevate whatever reasonable doubt might be raised." During trial, according to Barina, J.W.A's counsel gave him permission to talk to J.W.A. about his testimony if he were to call him at trial. During this meeting, Barina recounted, J.W.A., somewhat agitated, began insisting for the first time that he had seen M.P.A. "do it." Barina concluded that "[o]bviously, I could not call [J.W.A.] to the stand and possibly suborn perjury, and my client agreed that we should not call him to the stand."

White, J.W.A.'s trial counsel, who had cooperated with Barina in preparing for their respective trials before J.W.A.'s plea, opined that Barina "was effective as best he could with the facts that he had." He added that the most significant tactical focus was going to be on the children, who "did not do well during their initial interviews that we saw in their own jurisdiction" and that even the prosecutors "weren't so sure about how the victims or the children would hold up in a courtroom."

In summary, from the perspective of the attorneys involved, and based on our own review of the record, it appears that Barina was confronted with very difficult circumstances in defending M.P.A. However, despite these circumstances, the record of the adjudication trial reflects that Barina succeeded in defeating the State's motion to have the victims testify via closed circuit

29

television; he successfully moved for a directed verdict on one of the three counts against his client; he engaged in an effective cross-examination of S.A. that elicited testimony emphasizing her lack of knowledge or recollection regarding the details of the alleged abuse; he objected to the hearsay statements of Nurse Lindner and, outside the presence of the jury, argued extensively that the State's claimed hearsay exception did not apply, thus preserving that issue for appellate review; also outside the presence of the jury, he objected to Nurse Lindner's qualifications as an expert; and he attempted to present evidence relating to the custody battle between the parents that could have gone to the issue of the bias and motive of the victims to testify, although the juvenile court ultimately excluded such evidence as not relevant.

With these observations in mind, we proceed to consider M.P.A.'s specific allegations regarding certain aspects of Barina's performance.

### *Failure to interview and call as a witness the counselor for Catholic Charities*

Barina testified at the bill-of-review hearing concerning his knowledge of the children's interviews with Catholic Charities in 1997. During M.P.A.'s direct examination of him, Barina was shown the November 13, 2000 letter from Adair Pickard in which she claimed that "[e]ach child denied abuse and no definitive indicators were noted." Barina did not recall that alleged fact. On cross, the State established that Barina had obtained Kris Weis's social study and report, which had included information from Catholic Charities that the children had not made an outcry there, along with her opinions that this was not unusual. In his 2007 affidavit to the district court admitted during the habeas hearing, Barina explained why he did not pursue this line of evidence during the adjudication trial:

30

I did review the rendition in the Iowa report by Catholic Charities that there was no outcry of sexual abuse, but it appeared to me from the information provided at the time that the Florida officials had not directly confronted the children about possible sexual abuse. The Iowa report referenced the lack of outcry and then discussed the various reasons why children typically might not volunteer such information.

My concern at the trial was that an effort to introduce the opinion of a counselor to refute the theory that a sexual assault had occurred, based only on the fact that the children did not volunteer the information to the Catholic Charities counselor, would open the door for the State to bring in their experts, such as Dr. Frank Pugliese and a representative from the Children's Advocacy Center, to explain how demonstrated anxiety and other behavioral symptoms noticed in the children by the Florida counselor could translate into evidence of classic symptoms of sexual abuse. This would most affirmatively bolster the State's case in the jury's mind that sexual abuse did occur and work to the detriment of my client. I was also concerned that the State's effort to admit the judgment and judicial confession of [M.P.A.]'s brother, [J.W.A.], in order to hammer home that sexual abuse had indeed occurred, might be granted, and would then and further bolster evidence against [M.P.A.] as also having committed the offense. Clearly, to open that door was not in my client's best interest.

White, J.W.A.'s trial counsel, expressed a similar view in his affidavit submitted to the habeas court:

I knew about the reports of Catholic Charities that there was no outcry of sexual abuse to them by the children while in Florida. It appeared to me that neither [S.A.] nor [A.A.] were directly confronted by the counselors at Catholic Charities as to whether they had been sexually assaulted. From my client's viewpoint, I was very concerned by the Iowa report in that it appeared to explain why [S.A.] and [A.A.] might not have volunteered such information. To have introduced that type of testimony could open the door to other experts to testify as to possible symptoms of abuse demonstrated by the children and the testimony of representatives of the Child Advocacy Center regarding those symptoms.

During the habeas hearing, Barina testified that he had been unable to contact Ms. Pickard, although he could not recall how many times he tried to contact her or if he took other steps to ascertain Pickard's opinions. Barina acknowledged that he "would have thought about" calling Pickard to testify if Pickard had told him, as she later wrote, that the children "denied

abuse and no definitive indicators were noted," but "might not have done it" in light of "other issues in the trial."

We cannot conclude on this record that the district court abused its discretion in finding that Barina's decision to not present evidence concerning Catholic Charities was based on sound and legitimate trial strategy. As Barina indicated in his affidavit, he was concerned that if he presented this evidence suggesting that the abuse might not have occurred, the State would refute it with contrary and stronger evidence. Barina was aware of the Iowa custody report that referenced the lack of an outcry at Catholic Charities and that discussed the various reasons why children typically might not volunteer such information. By calling Pickard to testify to discuss her findings, Barina would have opened the door to the State calling witnesses to testify in rebuttal as to why the children might have been reluctant to discuss the abuse during the 1997 interview.

Citing to *Wiggins v. Smith*, 539 U.S. 510 (2003), M.P.A. also argues that Barina failed to fully investigate the evidence Pickard would have been able to provide. In *Wiggins*, the Supreme Court explained that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. . . . [A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id*. at 522-23 (quoting *Strickland*, 466 U.S. at 690-691). In this case, the district court found that Barina "performed sufficient trial preparation and investigation into the facts of the case," and the record supports that finding. Barina testified that he was aware of the evidence concerning Catholic Charities and that he attempted to call Pickard at least two times. That he was ultimately unable to talk with her despite his efforts to do

32

so does not demonstrate that his performance was deficient, especially in light of the circumstances of this case and the "heavy measure of deference to counsel's judgments" that is required.

Additionally, we observe that M.P.A. has failed to establish that the decision to not present evidence regarding Catholic Charities satisfies the second prong of the *Strickland* inquiry. M.P.A. did not make an offer of proof regarding exactly what evidence would have been presented, other than the letter itself. From that evidence, it appears that, at most, Pickard would have testified that the children denied abuse and that "no definitive indicators were noted." Given S.A.'s subsequent testimony at trial that abuse did occur, we cannot say that the absence of Pickard's testimony "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."

### *Failure to introduce evidence relating to S.A.'s difficulty in discussing the abuse with Kris Weis in the absence of her mother*

During the habeas hearing, Barina testified that he was aware that S.A. needed to take a break during her videotaped interview with Weis:

> Q: [S.A.] testified that at some point during the taping she had to take a break and go out and ask her mother what to say during the videotaping. Do you recall that being on the videotape?
>
> A: You know, I recall that they—either turning off or somebody stepping out in front. I haven't seen it recently. I talked to Mr. White about it. But I recall there was something where she does exit the room either because it's turned off or because she just exits. But yes, she does exit the room.
>
> Q: Okay. Was that something that concerned you as a defense attorney why she would have—why the interview would have to be interrupted?
>
> A: Yeah.

Q:     What steps did you take to find out why, in fact, the interview was interrupted?

A:     I watched the tape. I tried to get a flavor for the tape, one of the reasons that I called up there [to Iowa]. I believe I talked to Erika [Jordan] . . . about it because she had made a call or two up there as well to see what answers she got. And it was definitely something that was becoming more and more popular here to leave the screen, and I never liked it here. So that's one of the things I would have totally been curious about.

Q:     And did you get any answers to your inquiries as to why she left the screen?

A:     I'm sure.

Q:     Do you recall what those answers were?

A:     Specifically, no.

Q:     Okay.

A:     But I remember my thoughts were that other things might have been in play. But what the answers were from the people I spoke to, I don't recall what those were.

On cross-examination, Barina explained that, in his view, S.A. was asking to take a break during the interview not so much because she needed to get her mother to tell her what to say, but because S.A. was not "feeling very well" and was nervous "about being on camera."

In his affidavit, Barina explained why he did not pursue this matter during trial:

At the time of trial, I made repeated attempts to contact LaVonna Arena, the mother of the victims, [S.A.] and [A.A.], to get her side of the story and arrange for her to testify at the trial. At the time, there was a warrant in Bell County for her arrest alleging a theft and I was not able to make contact with her. I viewed the videotape made of [S.A.] in Muscantine, Iowa, on December 11, 1998, as well as reviewed the comments of the interviewing counselor. A report from a police detective in Muscantine, who was present during the videotaping, stated that while the camera was recording her statement, [S.A.] indicated nervousness about the camera and microphone. After the camera was turned off, the child told the

34

interviewers that she might be able to talk with them if her mother was present, and that she could practice with her mother by having her mother ask the questions. The detective was concerned that the mother might be able to coach the child and did not allow her to be in the room.

My impression was that [S.A.] was feeling a great deal of anxiety about discussing such personal issues with strangers and on camera, and wanted her mother to help calm down, not that she wanted her mother to tell her what to say. The statement by the later counselor that [S.A.] wanted to talk to her mother about what to say seemed to me to be an exaggeration of what actually occurred. The Muscantine authorities, in spite of the above, were convinced that sexual abuse to both children had occurred.

More importantly, though, the videotape referenced possible additional sexual assaults that had not been alleged by the State. I did not want the tape admitted into evidence because the rule of optional completeness would have allowed extraneous information to come in that would work to my client's detriment. I could not predict what the judge would or would not allow in if the tape were to be played. Likewise, I did not want any sponsoring witness for the tape to elaborate on what it contained or meant. All that would have led to was a bolstering of the State's case against [M.P.A.]

Barina's concerns were echoed in White's affidavit:

I viewed the tape of [S.A.] and [A.A.] made in Muscantine, Iowa, as well as the tapes made of them by The Children's Advocacy Center, regarding the allegations of sexual abuse. It did appear that [S.A.] was concerned about the cameras and microphones in the room and never asked to have her mother present in the room. In fact, it is my recollection that the interviewer from child services was the one who suggested that they take a break. My greater concern with the video was that the victims appeared to discuss other incidents of sexual assault by my client and [M.P.A.] that had not been charged and that I hoped to keep out as extraneous offenses.

We cannot conclude on this record that the district court abused its discretion in finding that Barina's decision not to present evidence that S.A. experienced difficulty in discussing the abuse in the absence of her mother was based on sound and legitimate trial strategy. Introducing evidence concerning S.A.'s interview with Weis, Barina believed, could have strengthened the

35

State's case. The district court could have found that this was a reasonable belief. Whatever difficulty S.A. may have had in discussing the abuse during the interview, she did ultimately discuss it. Barina could have reasonably determined that whatever he might have gained from presenting to the jury information that S.A. needed to take a break during the interview would have been offset by the damaging nature of the interview itself. In fact, the district court could have found, evidence concerning the interview would have likely bolstered S.A.'s trial testimony. Additionally, as Barina explained, there were other explanations for S.A. taking a break during her interview other than needing to talk to her mother, and, if Barina had made an issue of it, the State likely would have presented these alternative explanations to the jury. The State's explanation would have provided the jury with additional reasons to credit S.A.'s trial testimony.

M.P.A. again argues that Barina failed to fully investigate the evidence by not speaking personally with Weis. However, Barina testified that he reviewed the videotape and was aware of Weis's report and findings. The district court would not have abused its discretion in finding that, in light of what Barina already knew and the strategic decision Barina had made not to reveal that information to the jury, Barina did not need to personally speak with Weis.

Additionally, we again observe that the second prong of the *Strickland* inquiry has not been satisfied. When S.A. testified at trial, her mother was not present. Yet S.A. was nevertheless able to testify and describe the alleged abuse. We cannot say that the jury not being made aware that S.A., who was only seven years old at the time of her videotaped interview in 1997, may have needed to take a break during that interview "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."

36

### *Failure to refute Dr. Green's Expert Testimony*

The entirety of Barina's cross-examination of Dr. Green consisted of the following questions:

Q:  Dr. Green, now you used the word "suspicious" or possible. That's what we have here, it's possible that penetration occurred.

A:  Right.

Q:  And that's all you're here to say. That's probably an overstatement, but would that be a fair statement?

A:  Yes.

Q:  Now, you've never met [M.P.A.], is that correct?

A:  No, sir.

Q:  Now, the hymen as it exists here, is it possible this could have occurred naturally?

A:  I guess I want to know what you mean by naturally. Could she have been born this way?

Q:  Probably a bad question. Let me withdraw the question.

[Defense counsel]:     That's all I have, judge.

In his affidavit, Barina explained the reasons for his limited cross-examination of Dr. Green:

I determined not to vigorously cross-examine Dr. Green because her testimony was very tentative and cautious and I thought as good as I could hope for. I did not want to risk the State taking her on re-direct examination to counter what few "possibilities" I might be able to get her to admit to. Prior to the trial and [J.W.A.]'s plea, [counsel for J.W.A.] and I had discussed the feasibility of locating another expert to refute her findings. However, with the reality of [J.W.A.]'s plea, and after

37

considering the amount of time that had elapsed between the time of the alleged assault and Dr. Green's examination of the case, I determined that a vigorous cross-examination would not be advisable because of the threat of [J.W.A.]'s confession being introduced, or even [J.W.A.] being called to the stand himself.

. . . .

Applicant makes reference to the reports in August and September 2000 by pediatricians Stuart Coles and Susan P. Nickel. Dr. Coles reported that "the hymenal structure appears normal" with no sign of injury or scarring, and Dr. Nickel found only that her general examination was "generally unremarkable," without any mention of examination of her genitalia. As pediatricians, rather than OB-GYN specialists, there was no indication that they conducted the sort of invasive examination as would be done with a colposcope. Relying on additional expert evidence to refute evidence of sexual assault would have been a waste of time given brother [J.W.A.]'s confession that it had occurred. Had both brothers denied it, then I certainly would have pursued that avenue of defense.

White, in his affidavit to the district court, explained his opinion on Barina's strategy:

I was familiar with the trial strategy of Mr. Barina in the representation of [M.P.A.], and we had discussed some of the issues that would be in common between our two cases. Concerning the calling of an expert to refute the testimony of Dr. Green, it was my opinion at the time that it was not necessary because she could not testify with any certainty that a sexual assault was committed, but only that the physical evidence was at best suspicious. My recollection was that Dr. Green was the only OBGYN to review the photos of the examination performed in this case. Some general practitioners had examined the child, but no one with the credentials of Dr. Green. I had discussed the weak findings of any assault occurring but given the confession of my client to the court that he had sexually assaulted the children I was of the opinion that to call an expert would not have given any great advantage to the defense.

M.P.A. asserts that "scientific literature belied Dr. Green's conclusions" regarding the significance of a "scant" posterior rim hymen and that "renowned experts who have reviewed Dr. Green's findings strongly disagree" with Dr. Green's findings. M.P.A. claims that Barina was ineffective in failing to refute Dr. Green's testimony with his own medical expert who, in M.P.A.'s

view, would have been able to testify "that the prosecution's physical evidence was not indicative of sexual penetration and provided no corroboration whatsoever" of S.A.'s allegations. *See Gerstein v. Senkowski*, 426 F.3d 588, 608 (2d Cir. 2005).

In making this argument, M.P.A. overlooks the fact that Barina's trial strategy, as he explained at the habeas hearing, was to have J.W.A. testify that it was he, and not M.P.A., who had sexually assaulted S.A. Thus, Barina's strategy was not to refute the State's theory that S.A. had been assaulted. Rather, it was to suggest that someone other than his client was the perpetrator. Therefore, the district court could have reasonably inferred that, at the time Barina was preparing for trial, there was no reason for Barina to find his own medical expert to refute Dr. Green's testimony. To conclude otherwise would be to impermissibly judge Barina's trial strategy in hindsight, in light of the children's present claims that no abuse had occurred.

We also observe that Green's testimony was, as Barina observed, "very tentative and cautious" and likely "as good as [he] could hope for." All Green could say regarding her finding was that it was "suspicious" for "possible vaginal penetration." And, in his cross-examination of Green, Barina emphasized that fact. That Barina did not cross-examine Green more extensively does not demonstrate deficient performance. As Barina explained, he "did not want to risk the State taking her on re-direct examination to counter what few 'possibilities' I might be able to get her to admit to." Barina also explained that, prior to trial, he and White "had discussed the feasibility of locating another expert to refute her findings." However, "with the reality of [J.W.A.]'s plea, and after considering the amount of time that had elapsed between the time of the alleged assault and Dr. Green's examination of the case," Barina "determined that a vigorous cross-examination would not be advisable because of the threat of [J.W.A.]'s confession being introduced, or even [J.W.A.]

39

being called to the stand himself." We cannot conclude that the district court abused its discretion in finding that this was legitimate and sound trial strategy.

We overrule M.P.A.'s second issue.

**Issues related to Dr. Willoughby**

M.P.A.'s two remaining issues concern the testimony of Dr. Willoughby during the disposition hearing. As noted, Willoughby was presented as an expert "in the field of psychology and sex offender treatment" to give opinions, derived from the results of court-ordered psychological examinations, concerning the appropriate course of treatment for M.P.A. as it bore upon the jury's disposition decision. As the proponent of Willoughby's opinions, the State bore the burden of demonstrating, by clear-and-convincing evidence, their reliability (i.e., that they were based in sound scientific methodology). *See Jordan v. State*, 928 S.W.2d 550, 555 (Tex. Crim. App. 1996); *Kelly*, 824 S.W.2d at 573; *see also Nenno v. State*, 970 S.W.2d 549, 560 (Tex. Crim. App. 1998) (observing that "this inquiry is substantively identical to the inquiry mandated by the Supreme Court in the federal system in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 506 U.S. 579 . . . concerning the admissibility of scientific evidence under Rule 702").[9] To be considered reliable, scientific expert testimony must satisfy three criteria: (1) the underlying scientific theory must be valid; (2) the technique applying the theory must be valid; and (3) the technique must have been properly applied on the occasion in question. *See Kelly*, 824 S.W.2d at 573. "Factors that could affect a trial court's determination of reliability include, *but are not limited to*, the following: (1) the extent to which the

[9] Although juvenile adjudications are considered civil proceedings, criminal-law evidentiary rules and principles govern. *See In re M.A.F.*, 966 S.W.2d 448, 450 (Tex. 1998).

40

underlying scientific theory and technique are accepted as valid in the relevant scientific community, if such a community can be ascertained; (2) the qualifications of the expert(s) testifying; (3) the existence of literature supporting or rejecting the underlying scientific theory and technique; (4) the potential rate of error of the technique; (5) the availability of other experts to test and evaluate the technique; (6) the clarity with which the underlying scientific theory and technique can be explained to the court; and (7) the experience and skill of the person(s) who applied the technique on the occasion in question." *Id.* (emphasis in original).

In advance of Dr. Willoughby's testimony, M.P.A.'s trial counsel, Barina, took Willoughby on voir dire, outside the jury's presence, and examined him regarding the Abel Assessment. Willoughby explained the test as follows:

> The Abel Assessment is composed of both an objective part and then a questionnaire. The objective part of the test is where the individual sits in a room by him or herself and looks at a number of slides of different ages and different genders, male and female, and it really measures one's response time, how one looks at the various slides in comparison to other slides.

> The results are computerized and sent to Atlanta, Georgia, where the test is scored and then sent back to me. The premise of the test is if one has interest in children, that they proportionally will look longer at the children's slides, say, than the adult slides or the adolescent's slides.

In other words, in terms of the *Kelly* analysis, the scientific theory underlying the objective component of the Abel Assessment is that a person's sexual interest in different age and gender categories can be ascertained by measuring visual response time (termed "VRT" in the literature) to persons in those categories, while the Abel Assessment is a technique applying that theory, and Willoughby's administration of the Abel Assessment to M.P.A. would be the application of the

41

technique on the occasion in question. *See Emerson v. State*, 880 S.W.2d 759, 768-69 (Tex. Crim. App. 1994) (illustrating distinctions between underlying theory, technique applying that theory, and application on occasion in question in regard to admissibility of opinions based on results of horizontal gaze nystagmus (HGN) test).

Barina then inquired regarding factors bearing upon the reliability of the Abel Assessment and its underlying theory:

Q:      Is [the Abel Assessment] accepted in the scientific community as a test that's able to predict those people who have an interest in, I guess, particular types of sexes and age groups?

A:      Different age groups and different races—not different races, but gender, right.

Q:      It is accepted.

A:      Yes.

Q:      And I take it by your answer earlier, you're familiar with the underlying scientific theory.

A:      Yes.

Q:      Would you tell us about the existence of any literature supporting or rejecting this underlying scientific theory?

A:      Yes. There [are] a number of articles out by Gene Abel and his colleagues. Also researchers at Brigham Young University have established the reliability of the instrument and the classification accuracy of the instrument.

Q:      Any potential rate of error in the technique?

. . . .

A:      The accuracy rate for one having interest in males under the age of fourteen, to classify those people who do have significant sexual interest in males under the age of fourteen, the accuracy rate is 91 percent.

42

For those having significant sexual interest in females under the age of fourteen, the accuracy rate is 85 percent.

Following these questions, Barina inquired about the administration of the test to M.P.A. in particular. He asked whether the accuracy of the test would be impacted if the test subject had a reading disability (Willoughby indicated that it "should not, not in the objective part") and whether Willoughby was in the room while the test was being administered on M.P.A. (he indicated no, as he would leave the room after giving instructions). Thereafter, the State asked Willoughby a series of questions regarding his qualifications. Among other facts, Willoughby indicated that he had previously performed assessments on about thirty juvenile sex offenders, had contracts to provide services for both Bell County district and county courts, and had previously testified as an expert in both Bell and Williamson counties.

After the State concluded its questions, it asked the trial court to rule Dr. Willoughby qualified as an expert "to answer certain hypotheticals and opinion testimony in the field of psychology and sex offender treatment." Barina, while not disputing that Willoughby was qualified as an expert in the field, objected to Willoughby's testimony on the grounds that (1) the Abel Assessment was "not sufficiently reliable" because, per Willoughby's testimony, it had a fifteen-percent error rate with respect to identifying sexual interest in girls under the age of fourteen; and (2) Willoughby failed to admonish M.P.A. of his *Miranda*[10] rights prior to administering the tests. The trial court overruled both objections. Willoughby, over Barina's renewed objection, proceeded to opine, purportedly based on M.P.A.'s results from the Abel Assessment's objective component,

---

[10] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

that M.P.A. had "displayed significant sexual interest in eight to ten year-old females and two to four and eight to ten year-old males;" that, while not making a formal diagnosis, he would consider M.P.A. a "pedophile" who presented a high risk to re-offend; and that M.P.A. would require intensive and long-term treatment to overcome this strong sexual interest in children.

Having lost in his attempts to get Willoughby's opinions excluded, Barina attempted to elicit Willoughby's agreement that it was at least possible to devise a treatment plan for M.P.A. that would not require institutional confinement. He returned to a similar theme during closing arguments, while also suggesting to the jury that the Abel Assessment's accuracy rate as described by Willoughby "wasn't a great one." In the context of emphasizing Willoughby's acknowledgment that rehabilitation outside an institutional setting was at least possible, Barina termed Willoughby a "compelling witness, [who] had many credentials."

It turned out that the "researchers at Brigham Young University" whom Dr. Willoughby had testified "have established the reliability of the [Abel Assessment] and the classification accuracy of the instrument" had, in fact, advocated a diametrically opposite view. In a pair of articles published in July 1999—roughly one month before Willoughby had examined M.P.A. and three months before trial—Lane Fischer and Gillan Smith of BYU presented research they had conducted to evaluate the reliability and validity of the Abel Assessment's objective component when used with both adults and juveniles.[11] In the article addressing the technique's use

_____

[11] *See* Lane Fischer & Gillian Smith, *Statistical Adequacy of the Abel Assessment for Interest in Paraphilias*, 11 Sexual Abuse: A Journal of Research and Treatment 193 (No. 3, 1999); Gillian Smith & Lane Fischer, *Assessment of Juvenile Sex Offenders: Reliability and Validity of the Abel Assessment for Interest in Paraphilias*, 11 Sexual Abuse: A Journal of Research and Treatment 207 (No. 3, 1999). These articles, as well as others cited below, were included in the habeas record.

on adults, the researchers acknowledged that the VRT concept had some independent support in the research, that the technique's originator Abel and his colleagues had published a number of articles concluding that the test was an effective means of screening or identifying persons with paraphilias, and that the technique was apparently being used by approximately 300 therapists in 36 states, two foreign countries, and eight states' judicial systems.[12]  However, while terming the Abel Assessment "a promising instrument based on a sound idea" and "[t]he theory behind it" as "reasonable," the researchers concluded that "the evidence of its reliability and validity for use with adults is weak as of yet," characterized it as a "nonvalidated instrument," and advocated "further research" and "refinement" to ensure its reliability and validity.

In the other article addressing the use of the Abel Assessment on juveniles,[13] the researchers concluded that there had heretofore been no research studies addressing the reliability or validity of the test when used on juveniles:

> The normative ground defined by Abel (1998) apparently included only two adolescents.  There was no evidence that the AAIP [Abel Assessment for Interest in Paraphilias] produced reliable scores for adolescents, could screen deviants individually from normals, or could diagnose specific pathology in deviant subjects.

Thus, the researchers undertook a study regarding the use of the test on juveniles, and concluded:

---

[12] *See* Lane Fischer & Gillian Smith, *Statistical Adequacy of the Abel Assessment for Interest in Paraphilias*, 11 Sexual Abuse:  A Journal of Research and Treatment 193 (No. 3, 1999).

[13] Gillian Smith & Lane Fischer, *Assessment of Juvenile Sex Offenders: Reliability and Validity of the Abel Assessment for Interest in Paraphilias*, 11 Sexual Abuse: A Journal of Research and Treatment 207 (No. 3, 1999).

- "The test-retest data do not support the reliability of the AAIP for use with adolescents."

- "The screening validity data show that the ability of the AAIP to discriminate adolescent offenders from nonoffenders was not significantly better than chance."

- "The diagnostic validity data show that the ability of the AAIP to identify specific deviant attractions within the adolescent perpetrator group was poor."

- "While the AAIP is a promising instrument, its ability to screen or diagnose adolescent perpetrators reliably has not been demonstrated. No published data support its use with such a population. This study utilized a relatively small sample of participants in residential and day treatment programs. Further study with other populations and larger samples may demonstrate its effectiveness in the future."

Also, Dr. Willoughby had overstated the accuracy of the Abel Assessment that had been reported by the test originator himself. While Willoughby had testified to a fifteen-percent error rate (85 percent accuracy) in detecting sexual interest in girls aged 14 and under, Abel had published a 1998 study indicating only 65 percent accuracy as to girls and that group.[14]

In 2002, Betty Arena filed a disciplinary complaint against Willoughby with the Texas State Board of Examiners of Psychologists (the Board) concerning his examination of M.P.A. and subsequent trial testimony. The Board's disciplinary proceedings against Dr. Willoughby were ultimately concluded by an August 2003 agreed order in which Willoughby accepted a reprimand and various monitoring requirements for having violated Board rules pertaining to substantiation of

---

[14] Gene G. Abel, Jeffrey Huffman, Brent Warberg & Clarence L. Holland, *Visual Reaction Time and Plethysmography as Measures of Sexual Interest in Child Molesters*, 10 Sexual Abuse: A Journal of Research and Treatment 81, 91 (No. 2, 1998).

Willoughby did, however, testify consistently with Abel's study in representing that the Abel Assessment was ninety-one percent accurate with respect to sexual interest in boys of the same age group.

and limitations on forensic services. The agreed order, signed by Willoughby, included findings of fact that Willoughby "misstated in his court testimony the research that had been conducted with respect to the Abel assessment" but "does not admit any violations referenced in the foregoing Finding[] of Fact."

Relying on the foregoing evidence, M.P.A. alleged that Dr. Willoughby "perjured" himself when testifying that (1) "researchers at Brigham Young University have established the reliability of the [Abel Assessment] and the classification accuracy of the instrument," when they had actually attacked the technique's reliability and accuracy, especially with regard to its use with juveniles; (2) the technique was 85 percent accurate in detecting sexual interest in prepubescent girls, when, in fact, Abel himself had reported only 65 percent accuracy; and (3) the theory or technique had been "accepted" in the scientific community as being able to predict or detect sexual interest in different age and gender categories, when, in fact, the BYU researchers and the Board had demonstrated the absence of independent verification of reliability for adults and no research studies (except their unfavorable one) for juveniles. In his third issue, M.P.A. urges that the district court abused its discretion in denying him relief on this claim.

The State's "knowing" "use" of "false" testimony violates due process. *See Ramirez v. State*, 96 S.W.3d 386, 393-97 (Tex. App.—Austin 2002, pet. ref'd). The State does not dispute that it "used" Willoughby's testimony within the meaning of this prohibition. As for whether Willoughby's testimony was "false," while many of the cases refer to "perjured" testimony, it has been held that "[t]here is no need for a defendant to show the witness knew the testimony was false or otherwise harbored a sufficient culpable mental state to render the witness subject to prosecution for perjury"; rather, "it is sufficient if the testimony is false and misleading to the trier of fact." *Id.*

at 395. Likewise, "whether the rule is violated or not does not depend upon the defendant's ability to demonstrate the witness's specific factual assertions were technically incorrect or 'false.' It is sufficient if the witness's testimony gives the trier of fact a false impression." *Id.* The State does not dispute that Willoughby's testimony was false and misleading to the trial court, at least with regard to Willoughby's depiction of the the BYU researchers' articles. Finally, as for whether the State acted "knowingly," M.P.A. concedes that the State's reliance on Willoughby's false testimony was "inadvertent." However, since the time of the district court's habeas ruling, the court of criminal appeals has held (albeit in a case where a key witness was found to have intentionally lied on the stand) that the State's unknowing use of the testimony violated due process and was remediable through post-conviction habeas relief. *See Ex parte Chabot*, 300 S.W.3d 768, 770-72 (Tex. Crim. App. 2009).

The district court did not make an explicit finding as to whether Willoughby gave false testimony or did so intentionally versus inadvertently. While M.P.A. portrays Willoughby's agreed order as an admission of intentional falsification, the State points out that the order goes no farther than admitting "misstatements." However, the State joins issue primarily as to whether M.P.A. has demonstrated harm from Willoughby's testimony. The court of criminal appeals has classified the "use" of "false" testimony by the State as "trial error" that is subject to a harmless-error analysis. *See id.* at 771 (quoting *Ex parte Fierro*, 934 S.W.2d 370, 374 (Tex. Crim. App. 1996)). Consequently, the court of criminal appeals has explained, the "applicant has the burden to prove by a preponderance of the evidence that the error contributed to his conviction and punishment." *Id.* (quoting *Fierro*, 934 S.W.2d at 374-75). This means that the applicant must demonstrate that it is probable—i.e., more likely than not—that the error contributed to the applicant's conviction or

48

punishment. *See id*. at 772; *Fierro*, 934 S.W.2d at 376. This harm standard is thus more demanding than the harmless-error standard normally applied to constitutional errors in criminal cases. *See Fierro*, 934 S.W.2d at 376 ("The difference between the . . . standards is the difference between a possibility and a probability.").

As the State suggests, M.P.A. can demonstrate that Willoughby's complained-of statements probably contributed to his punishment only if he can show (1) it is more likely than not that Willoughby's opinions derived from the Abel Assessment would have been excluded had he testified truthfully or accurately during voir dire; and (2) those opinions, once admitted, more likely than not contributed to the jury's decision to impose a twenty-year sentence and not some lesser punishment. The district court did not make an explicit fact finding as to the first requirement but did make a finding regarding the second: "The evidence presented indicated that the jury was not likely swayed by the testimony of Dr. Willoughby, but rather by the direct testimony of the two children in this case." Based on this finding, the district court concluded that M.P.A. "failed to show by a preponderance of the evidence that misstatements, if any, by Dr. Willoughby contributed to his punishment."

On appeal, M.P.A. urges that if Willoughby had testified accurately about the contents of the BYU article during voir dire—i.e., "the trial judge [was] told that 'no data were available to support the use of the [Abel Assessment] with adolescents'"—the trial court would have had to "ignore[] the *Daubert* and *Kelly* standard" to admit Willoughby's opinions derived from the test. The State, urging that the habeas record demonstrates that the Abel Assessment "was indeed in widespread use and well accepted" at time of trial, counters that Willoughby's opinions "concerning

49

the Abel Assessment may still have been allowed in evidence . . . despite the only two articles critical of the assessments being published very shortly before trial."

In addition to the reporter's record from M.P.A.'s trial, the district court considered additional evidence relevant to the harm determination during the habeas proceeding. Both M.P.A.'s trial counsel, Barina, and J.W.A.'s trial counsel, White, testified that, as they prepared for Willoughby's testimony,[15] they inquired about the Abel Assessment with local practitioners and received favorable (or at least non-negative) feedback. Barina testified that in addition to interviewing Willoughby, he consulted with a Waco psychiatrist "who also liked the test as an assessment tool," regarded it as accurate, and was "actually the test's biggest fan." Barina further elaborated that both Willoughby and a Dr. Hurlbert had previously utilized the Abel Assessment when testifying as experts in area courts on issues related to sex offender treatment, and that "[t]he Abel Test, as far as I knew, had become, for lack of a better word, in vogue just before this trial in this area." Barina added that he had consulted several local attorneys regarding their impressions of the Abel Assessment, and they had generally indicated their belief that the test was "accurate."[16]

White added that prior to J.W.A.'s plea, he and Barina had jointly investigated the possibility of obtaining an expert to attack the reliability of the Abel Assessment, and determined the following:

> Q:     And did you talk to Bobby Barina about those [Abel] exams as well?

---

[15]  Apparently Willoughby also administered the Able Assessment to J.W.A. and was to testify in his trial before J.W.A. pled out.

[16]  The one exception Barina noted was his father, then a local judge.

50

A:  I discussed the case with Mr. Barina because the family did want them to be defended jointly. I discussed things with Mr. Barina probably once or twice a week for several weeks.

Q:  Okay.

A:  And Mr. Willoughby came up. And it was in regards to his evaluation or his examinations and whether those things would be admissible or not.

Q:  Okay. And what were your—your concerns about the Abel exam?

A:  That's pretty much at the beginning when *Daubert* became an issue and those cases around *Daubert* whether that was a scientifically reliable test or not. The problem is it really had not swung one way or the other whether such an examination or evaluation would be admissible or not, whether it was scientifically reliable. We couldn't really find an expert to say yes, it was scientifically reliable. We couldn't find an expert to say no, it was not scientifically reliable.

Q:  Did you attempt to contact any experts?

A:  We—I discussed—I remember one expert. I can't recall the name. That person would not go out on a limb and say that that test was not scientifically reliable.

Both counsel opined that, given the feedback they were obtaining and the use of the Abel Assessment locally, Willoughby's opinions would have been admitted regardless whether they had learned of the BYU articles. Barina averred:

Applicant notes that at the time of trial that two articles by Fischer and Smith concluded that studies of the validity of the Abel Assessment were "weak," especially when used on adolescents. . . . I was not aware of these studies, which apparently came out only a few months before trial, and disagree that I would be able to determine that the theory behind the Abel Assessment was not accepted in the scientific community. I had already talked to two practitioners [Willoughby and the Waco psychiatrist, as previously discussed] who did accept it.

51

Similarly, White averred:

> Subsequently to the plea of [J.W.A.], I have learned that two articles had concluded that the validity of the articles regarding the Abel Assessment were "weak." I was not aware of these two articles, which had come out only shortly before trial, but I have no reason to believe that Dr. Willoughby would have been excluded as an expert if I had known about them. I had spoken to at least one other physician and he did not indicate that the test was not scientifically accepted.

Additionally, Jeanne Parker, the prosecutor during trial who had questioned Willoughby, opined that she believed the evidence would have been admissible regardless of the articles:

> I was not aware of any articles or journals that had called into question the effectiveness of the testing done by Dr. Willoughby. Even if those articles would have been brought to our attention I believe that his testimony would have been admissible and that the articles would have only gone to the weight of his testimony. I had spoken with at least one other physician and he did not indicate that the test was not scientifically accepted.

The habeas record also included two articles published by Abel, the test's originator, subsequent to M.P.A.'s trial. In one, published in 2000, Abel responds to Smith and Fischer's articles, characterizing their conclusions as outliers that were founded on faulty research methodology and a misunderstanding of the Abel Assessment.[17] Abel indicated that, in addition to his own 1998 study, "four independent research groups" in 1999 "presented studies based on data sets from different parts of the country; two from community populations and two from incarcerated

---

[17] Gene G. Abel, *The Importance of Meeting Research Standards: A Reply to Fischer and Smith's Articles on the Abel Assessment for Sexual Interest*, 12 Sexual Abuse: A Journal of Research and Treatment 155 (No. 2, 2000).

populations that confirmed th[e] utility" of "visual reaction time in assessing child molesters."[18]  In

the second article, not published until 2004, Abel and several colleagues presented results of their

research to determine the validity of the Abel Assessment with male adolescents who have molested

children.[19]  They concluded that the test "is also a valid instrument for identifying male adolescents

who molest children."[20]  The authors acknowledged that "[a] previous attempt to use VRT [visual

reaction time] to classify child molesters (Smith and Fischer, 1999) had proved unsuccessful," but

again criticized the methodology.[21]

      During the years since M.P.A.'s trial, several courts, both in Texas and elsewhere,

applying *Kelly*, *Daubert*, or similar standards to the records developed in those proceedings, have

excluded Abel Assessment-based expert opinion as unreliable.[22]  However, the issue before us is not

---

[18]  *Id*. at 155.

[19]  Gene G. Abel, Alan Jordan, Joanne L. Rouleau, Robert Emerick, Sharen Barboza-Whitehead & Candice Osborn, *Use of Visual Reaction Time to Assess Male Adolescents Who Molest Children*, 16 Sexual Abuse:  A Journal of Research and Treatment 255 (No. 3, July 2004).

[20]  *Id*. at 262.

[21]  *Id*.

[22]  *See, e.g.*, *In re CDK*, 64 S.W.3d 679, 682-84 (Tex. App.—Amarillo 2002, no pet.) (reversing parental-termination decree in case where CPS used Abel Assessment results against parents, emphasizing proof that Abel's method for scoring computer test results was proprietary and could not be independently tested or validated); *see also Figueroa v. State*, No. 04–08-00452-CR, 2009 Tex. App. LEXIS 5604 (Tex. App.—San Antonio July 22, 2009, no pet.) (mem. op., not designated for publication) (holding that sex-crime defendant failed to establish reliability of Abel Assessment results by clear and convincing evidence); *United States v. Birdsbill*, 243 F. Supp. 2d 1128, 1131-36 (D. Mont. 2003) (in sex-crime case involving both Native American defendant and victim, holding that Abel Assessment-based evidence was both irrelevant and unreliable; provides extensive review of research and scholarly debate concerning the technique); *United States v. White Horse*, 177 F. Supp. 2d 973, 974-76 (D.S.D. 2001) (finding that Abel Assessment-based evidence offered by Native American defendant accused of sexually abusing his son was not reliable; held in part that "the validity of the Abel Assessment has not been sufficiently tested with regard to

53

whether we would exclude Willoughby's testimony based on current jurisprudence and/or the records developed in other cases, nor is it whether we would hold the trial court's admissibility ruling to have been an abuse of discretion when viewed through such hindsight. Instead, we must determine, based on the habeas record here, whether the district court abused its discretion in failing to find that Willoughby's misstatements more likely than not caused the trial court to admit his opinions when it otherwise would have excluded them. On this record, we cannot conclude that the district court did. Among other things, the habeas record reflects evidence that, by time of trial, "independent" studies had validated VRT and the Abel Assessment and that, moreover, the case law applying *Kelly* and *Daubert* in Texas state courts was still in its evolution.

Thus, assuming without deciding that the State's "inadvertent" "use" of Willoughby's misstatements could otherwise have been a basis for habeas relief, we hold that the district court did not abuse its discretion in failing to find that the misstatements more likely than not impacted the trial court's decision to admit Willoughby's opinions. Because the district court's disposition of

---

Native American subjects"), *aff'd*, 316 F.3d 769 (8th Cir. 2003); *but see United States v. Robinson*, 94 F. Supp. 2d 751, 752 (W.D. La. 2000) (based on record that included Abel's testimony, holding that Abel Assessment-based evidence offered by sex-crime defendant to prove that he lacked sexual attraction to persons in victim's age group was reliable and admissible).

In an unpublished opinion that predated M.P.A.'s trial, this Court upheld a trial court's exclusion of expert testimony derived from Abel Assessment results. A juvenile charged with sexual contact with a child had attempted to introduce the evidence to prove that he was not sexually attracted to children in the alleged victims' ages and genders and, in turn, did not have the requisite intent to touch the victims' "private parts." *See In re J.G.*, No. 03-97-00217-CV, 1998 Tex. App. LEXIS 3212, at *2-6 (Tex. App.—Austin May 29, 1998, no pet.). The basis of this Court's holding was lack of relevance—much like testimony regarding the results of a polygraph test, the evidence would have supplanted the jury's decision on an ultimate issue within its province and ability (whether the defendant intended to touch the victims sexually on the occasion in question) rather than assisting the jury in understanding the evidence. *See id*. This Court did not address the reliability of the disputed evidence.

M.P.A.'s false-testimony claim can be sustained on this ground, we need not reach, and express no opinion on, whether M.P.A. demonstrated that Willoughby's opinions, once admitted, probably contributed to the jury's punishment assessment. We overrule M.P.A's third issue.

In his fourth issue, M.P.A. urges that the district court abused its discretion in declining to grant relief on his claim that Barina rendered ineffective assistance during disposition. M.P.A. complains that Barina failed to adequately investigate the scientific support for Willoughby's opinions prior to trial and that if he had done so, Barina could have confronted the witness when he testified falsely during voir dire and gotten him excluded.

Again, the district court found that "[t]he evidence presented to this Court indicated that the actions of Bobby Barina during the trial of [M.P.A.] were based on sound and legitimate trial strategy. Applicant's trial attorney performed sufficient trial preparation and investigation into the facts of the case, and all decisions regarding evidence presented were sufficiently explained and shown to be sound trial strategy." In light of these findings, the district court concluded that "based on the facts available to Applicant's trial counsel at the time of trial that his actions and decisions were based on legitimate trial strategy, and the trial preparation of Applicant's trial counsel was adequate and within the bounds of reasonably effective representation," and that "Applicant received a fair and reliable trial." The district court did not make any explicit findings relating to Barina's performance specifically in regards to Willoughby.

We think it is important here to emphasize what the Supreme Court said in *Strickland* concerning a court's review of counsel's performance:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or

55

adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way. . . .

. . . .

Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case. At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.

466 U.S. at 689-91 (internal citations omitted).

M.P.A. is claiming that Barina failed to adequately investigate the scientific support for Willoughby's opinions. When assessing the reasonableness of an attorney's investigation, a reviewing court must consider the quantum of evidence already known to counsel and whether the known evidence would lead a reasonable attorney to investigate further. *Wiggins*, 539 U.S. at 527; *Ex parte Martinez*, 195 S.W.3d 713, 721 (Tex. Crim. App. 2006). "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations

unnecessary. . . . [A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691. "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id*. at 690-91.

Here, the record supports a finding by the district court that Barina researched the issues related to the Abel Assessment. In addition to the pretrial research and investigation previously described, Barina testified that he "would look at different testing [researchers] were doing and trying to find out information from testing organizations. You know, going to the Baylor Law Library and reading up on it and things like that." Barina added he had previously worked with Dr. Hurlbert and had prepared to present him as an expert at trial, though "the cases always worked out." In this preparation, according to Barina, "Hurlbert had already showed me how the tests worked before, so I got to ask him questions about that, and looked at him perform the test."

Thus, Barina provided testimony from which the district court could find that Barina investigated the reliability of the Abel Assessment, and we are to defer to the district court's assessment of the credibility of that testimony. The remaining question is whether Barina's decision not to investigate further and ultimately uncover the BYU articles or other research tending to refute Willoughby's opinions was reasonable under "all the circumstances, applying a heavy measure of deference to counsel's judgments." *See id*. at 691. In other words, under the circumstances, did Barina exercise "reasonable professional judgment." *See id*. at 690-91.

We conclude that Barina did. The record reflects that Barina, informed by his research regarding the Abel Assessment and the then-existing law, made a strategic decision to focus

57

on the test's error rate. Through his research, Barina had determined that the test had an accuracy rate of only 85% and thus an error rate of 15%.[23] This was, in Barina's view, a "horrible number" that should have resulted in the test results being excluded. And, as discussed above, Barina attempted to persuade the district court to exclude Dr. Willoughby's opinions as unreliable in light of the test's error rate. Under all the circumstances confronting Barina, and given the state of jurisprudence at the time of trial, as we discussed above, we cannot conclude that this was an objectively unreasonable decision. In fact, by raising the test's error rate at trial and attempting to exclude the evidence on that ground, Barina preserved this issue for appellate review. *See Emerson*, 880 S.W.2d at 769 (declining to take judicial notice of reliability of test that had "average margin of error of .03%"); *Kelly*, 824 S.W.2d at 573 (listing "potential rate of error" as one factor courts should consider in assessing reliability of particular scientific technique).

Moreover, in addition to attempting to exclude the evidence based on the error rate, Barina cross-examined Willoughby and got him to admit that treatment plans were available and that it was possible for parents to provide a supervised environment for their child if the child was placed on probation. As noted above, Barina referred to the above testimony in his closing argument, along with Betty Arena's testimony in which she promised to provide M.P.A. whatever level of supervision his treatment required, regardless of her personal views as to whether M.P.A. had actually committed the crimes for which he had been adjudicated guilty. As Barina explained in his affidavit, this was part of his strategy: "My intention at the time was to preserve what I

---

[23] At the habeas hearing, M.P.A. claimed that the accuracy rate of the exam, according to Dr. Abel, was only 65%. In fact, the error rate varies depending on the analysis. *See Birdsbill*, 243 F. Supp. at 1135-36. Regardless of the actual error rate, M.P.A. does not dispute that the error rate was a legitimate issue for Barina to raise.

perceived as good appellate issues with respect to whether [M.P.A.] should have been committed to the Texas Youth Commission rather than placed on some treatment plan."

M.P.A. also complains about Barina's alleged failure to obtain a witness to counter Willoughby's testimony. *See Gersten*, 426 F.3d at 611 (concluding that counsel's failure to challenge prosecution's psychological expert with his own expert constituted ineffective assistance). However, "[t]rial counsel's failure to call an expert is irrelevant absent a showing that an expert witness was available to testify on this issue and the expert's testimony would have benefitted Appellant." *Garza v. State*, 298 S.W.3d 837, 842 (Tex. App.—Amarillo 2009, no pet.) (citing *King v. State*, 649 S.W.2d 42, 44 (Tex. Crim. App. 1983)). M.P.A. failed to make such a showing. White testified that he and Barina "couldn't really find an expert to say yes, it was scientifically reliable" or "no, it was not scientifically reliable." When asked if he and Barina had attempted to contact any experts, White testified, "I remember one expert. I can't recall the name. That person would not go out on a limb and say that that test was not scientifically reliable." M.P.A. asserts that Barina could have called the BYU researchers to refute Dr. Willoughby's opinions. However, M.P.A. made no showing that the BYU researchers or any other experts on the subject matter were available to testify at the time of M.P.A.'s trial.

In light of the above, we cannot conclude that the district court abused its discretion in finding that Barina exercised sound and legitimate trial strategy regarding Willoughby.

We overrule M.P.A.'s fourth issue.

## CONCLUSION

We affirm the order of the district court.

_____

Bob Pemberton, Justice

Before Justices Patterson, Pemberton and Waldrop

Affirmed

Filed:   July 14, 2010